UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

HELEN G. RIORDAN

                 Plaintiff,

    -against-                             1:08-CV-1229 (LEK/DRH)

BJ's WHOLESALE CLUB, INC.,

                 Defendant.

_____

## MEMORANDUM-DECISION AND ORDER

### I.    INTRODUCTION

Helen G. Riordan ("Plaintiff" of "Riordan") brings this action under the Age Discrimination Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the New York State Human Rights Law ("NYHRL"), N.Y. EXEC. LAW § 290 *et seq.*, alleging that BJ's Wholesale Club, Inc. ("Defendant" or "BJ's") wrongfully terminated her because of her age.  Compl. (Dkt. No. 1).  Presently before the Court are Defendant's Motion for summary judgment (Dkt. No. 23) and Plaintiff's Cross-Motion for sanctions and/or an inference of discrimination (Dkt. No. 28).  For reasons that follow, Defendant's Motion is granted and Plaintiff's Cross-Motion denied.

### II.    BACKGROUND

BJ's Wholesale Club, Inc. is a general merchandise warehouse retailer based in Natick, Massachusetts, with stores across the nation, including one located in Saratoga Springs, New York (the "Saratoga Springs Club").  Def.'s SOMF (Dkt. No. 23-1) ¶¶ 1, 3.  In 1997, Riordan applied and was hired for a full-time Merchandise Demonstrator position at BJ's Saratoga Springs Club; she

was 78 years old.[1]  Def.'s SOMF ¶¶ 39, 41-42.  Approximately ten years later, on September 4, 2007, BJ's terminated Riordan, who was then 88 years old.  Compl. ¶ 19.

In her capacity as a Merchandise Demonstrator, Riordan was responsible for demonstrating and promoting food products to BJ's customers.  Def.'s SOMF ¶ 47.  She would set up a demo cart with food items, serving cups, and utensils, and offer samples to customers.  Pl.'s Dep. (Dkt. no. 31-52) at 137-39.  Because she was involved in food preparation and handling, knowledge and adherence to food sanitation and safety rules was an important aspect of her job.  Pl.'s Dep. (Dkt. Nos. 31-52, 31-53) at 171-89.  Although the extent of Riordan's training remains unclear, she admits to taking yearly food safety quizzes that BJ's administers to Merchandise Demonstrators. See Pl.'s Dep. (Dkt. No. 31-52) at 180-84; Kozak Aff., Ex. 15 (Dkt. No.23-22).  She also signed a "Food Handler Sanitary Standards" document that outlines numerous rules governing food sanitation and food server hygiene and conduct.  Pl.'s Dep. (Dkt. No. 31-52) at 184; Kozak Aff., Ex. 16 (Dkt. No. 23-23).  One of these rules requires a server to notify her supervisor if she is ill; another prohibits a server from working while sick or while exhibiting conditions including vomiting.  Id.; Pl.'s Dep. (Dkt. Nos. 31-52, 31-53) at 171-189.  Above Riordan's signature, the Food Handler Sanitary Standards document states "I UNDERSTAND THAT FAILURE TO COMPLY WITH THE ABOVE STANDARDS WILL RESULT IN DISCIPLINARY ACTION UP TO AND INCLUDING TERMINATION."  Kozak Aff., Ex. 16 (Dkt. No. 23-23).

In 2004 or 2005, a customer allegedly complained to Jim Dobiel, Riordan's Manager at the time, claiming that Riordan had been rude to her.  After receiving the customer's complaint, Dobiel

---

[1] Christine Toich, a Personnel Supervisor, was involved, and according to Riordan, was instrumental in her hiring and orientation process.  Pl.'s Dep. (Dkt. No. 31-51) at 107:8-108:3; but see Toich Dep. (Dkt. No. 23-15) at 7-9, 50 (Toich was involved but only as a "clerical").

allegedly told Riordan that she should "pack up and go home"; when she refused, Dobiel allegedly

told Riordan, "You know, you're too old to work.  Why don't you quit?"  Pl.'s Dep. (Dkt. No. 31-

51) at 122-24.  Following this exchange, Riordan called Lynn Mallaro, BJ's Area Human Resources

Manager, who remembers having a phone conversation with Riordan about the way Dobiel handled

a customer complaint situation involving Riordan.  Mallaro failed to document the incident and

does not recall Riordan telling her that Dobiel making offensive remarks.  Pl.'s MOL at 9-10; see

also Mallaro Dep. (Dkt. No. 31-41) at 23:9-25:21

        Approximately three years later, on April 20, 2007, Riordan's husband passed away.  Compl.

¶ 19.  Understandably, she became "distressed," and in her grief, could not eat for "a couple of

weeks" and only drank water.  Pl.'s Dep. (Dkt. No. 31-54) at 251, 267-68.  During this period, on

more than one occasion, Riordan admits to vomiting at work, including at her cart (though not while

she was working), in an aisle, and near the meat department.  Pl.'s Dep. (Dkt. No. 31-53) at 247-55.

Riordan states that she would vomit into plastic bags, buckets, or garbage cans, sometimes in front

of other employees.  Pl.'s Dep. (Dkt. Nos. 31-53, 31-54) at 246-71.  Riordan did not report any of

this to the store's General Manager, Sandy Ryan, or Assistant Manager, Raymond Newberry, stating

"I didn't have to report it, everybody knew it, everybody but the manager."  Id. at 263.  The record

leaves unclear exactly how many vomiting episodes there were, but Riordan insists that none

occurred after April 2007.  Pl.'s Dep. (Dkt. No. 31-54) at 260.

        On July 2007, a BJ's meat wrapper alerted Christine Toich and another employee,

Bernadette Zawistowski, that Riordan was sick and may have vomited in a bucket at her cart.  Toich

Dep. (Dkt. No. 23-15) at 80-84.  Toich went with Zawistowski to what she believes was Riordan's

cart and found the bucket.[2]  Id.  Riordan was not present.  Id.  Toich spoke with Ryan about the incident, who told her to write up a "corrective."  Id. 82-83.  Ryan recalls that Zawistowski also informed her of this incident.  Ryan Dep. (Dkt. No. 23-12) at 123-24.

Ryan then informed Mallaro about the incident, and the two decided that, while the particular violation was sufficiently "egregious" to warrant termination, Ryan should instead issue Riordan a  "Final Written Corrective."[3]  Ryan Dep. (Dkt. No. 31-40) at 162; Mallaro Dep. (Dkt. No. 31-42) at 51-52.  On July 19, 2007, Ryan had Riordan sign a Team Member Corrective Interview Form that states: "On 7/15/07 it was brought to our attention that you Helen have had some incidents at your cart where you have been vomiting in a bucket right at your food cart – This is a very serious sanitation issue . . . . If you should vomit again at your cart you will be terminated immediately."  Kozak Aff., Ex. 18 (Dkt. No. 23-25).

On September 2, 2007, Lisa Billings, a Frontline Supervisor, informed Ryan that two customers reported seeing Riordan vomit at her cart.  Ryan Dep. (Dkt. No. 31-40) at 140.  Billings did not fill out an incident report, nor did the customers.  Id. at 141.  Nevertheless, the following day, Ryan confronted Riordan about the accusation, and she claims that Riordan admitted to its truth; Riordan, however, denies ever vomiting at work in September.  Id. at 142-43; Pl.'s Dep. (Dkt. No. 31-54) at 260.  Ryan then spoke with Mallaro, and the two agreed that Riordan should be terminated.  Ryan Dep. (Dkt. No. 31-40) at 155-58; Mallaro Dep. (Dkt. No. 31-42) at 54, 57.  On

---

[2] Toich saw the bucket but did not look inside; she states that Zawistowski did and told her that it was full of vomit.  Toich Dep. 80-82.

[3] Toich, Ryan, and Mallaro testified that disciplinary measures are dependent upon the seriousness of the infraction, not solely the number of infractions, and that some violations can trigger immediate termination.  See Dkt. Nos. 31-39 – 31-46.

September 4, 2007, Ryan drafted another Team Member Corrective Interview Form.  Kozak Aff.,

Ex. 19 (Dkt. No, 23-26).  Marked "Termination of Employment," it states:

> On 9-2-07 it was brought to my attention that you vomited at your demo cart.  I confronted you concerning the above issue, and you admitted you did vomit while performing your demo.  On 7-17-07 you were placed on a final written for this same issue.  Helen, it is completely unacceptable and a great sanitation concern.  Due to the above, your employment has been terminated.

id.  Because Ryan was not working the following day, she explained the situation to Newberry, gave

him the Team Member Corrective Interview Form, and instructed him to terminate Riordan.  Ryan

Dep. (Dkt. No. 31-40) at 144-45; Newberry Dep. (Dkt. No. 31-47) at 27-28.

The next day, Newberry and Toich met with Riordan in an office to deliver the termination.

Def.'s SOMF. ¶ 100.  Newberry read Riordan the above quoted September 4, 2007 Team Member

Corrective Interview Form, and asked Riordan to sign it, which she refused to do.  Kozak Aff., Ex.

19 (Dkt. No, 23-26); Newberry Dep. (Dkt. No. 31-47) at 101.  Newberry and/or Toich told Riordan

that she should "[t]ake a six-month vacation" and told her to "feel better."  Pl.'s Dep. (Dkt. No. 31-

55) at 332-34.  Toich had made similar comments on prior occasions, often suggesting that Riordan

should "go to Florida," where she knew Riordan's daughter lived.  Id. at 329-332.  Toich had also

previously suggested that Riordan "go down and live with [her] daughter," adding that she might be

able to get a transfer if she wants one.  Id. at 331.

At some point after being fired, Riordan returned to BJ's and saw a much younger woman

performing food demonstrations in the same spot that she did before her termination.  Id. at 335-40.

BJ's denies that it hired anyone to replace Riordan.  Answer (Dkt. No. 7) at ¶ 23.

While Riordan never lodged any formal complaints about discrimination during her tenure at

BJ's, a fact she attributes to lack of training and avenues for doing so, she asserts that BJ's fired her

because of her age.  See generally Compl.  Riordan insists that there could be no other reason for her

termination since she had not received three disciplinary write-ups, and that various direct and

circumstantial evidence show Defendant's discriminatory animus.  On November 2, 2007, she filed

a complaint with the Equal Employment Opportunity Commission ("EEOC"); on August 19, 2008,

the EEOC provided her a Notice of Right to Sue. Id. ¶¶ 9-13.  She commenced this action on

November 17, 2008.  Id.

### III.    RULE 37 SANCTIONS

Before turning to Defendant's Motion for summary judgment, the Court will address

Plaintiff's Cross-Motion made pursuant to Federal Rule of Civil Procedure 37.  Dkt. No. 28.

Plaintiff asks the Court to sanction and/or impose an adverse inference of discrimination against

Defendant for the latter's alleged alteration of "key personnel documents" that were in its

possession.  Id.; Pl.'s Mem. in Opp'n to Summ. J. Mot. and in Supp. Cross-Mot. (Dkt. No. 29)

("Pl.'s MOL") at 11-13.  The relevant documents are Riordan's Attendance Card and a Discipline

Tracking Log from the 2007 calendar year.  See Kim Aff., Exs. B-D (Dkt. Nos. 28-2 – 28-4).

Plaintiff first received these documents on November 29, 1997, presumably in anticipation of this

litigation or as part of her application to the EEOC.  Kim Aff. (Dkt. No. 28-1) ¶ 3.  Plaintiff used the

documents, and marked them for identification during the depositions of Ryan, Mallaro, Toich, and

Newberry.  Id. ¶ 4.  On January 4, 2010, pursuant to discovery requests, Plaintiff received

documents including the same 2007 Attendance Card and Discipline Tracking Log.  Id. ¶¶ 5-9.

A comparison of the two sets of documents reveals that marks that are present on the later

versions, are not present in their earlier form.  Specifically, the earlier Attendance Card bears only

the mark "E", a code designating "Left Early (excused)" on March 16; no mark appears for March

6

22 or April 8; June 29 and July 1 bear only the mark "P-day", designating a "Personal" day; and

September 4 bears only the mark "UA Termed", designating an unexcused absence and termination.

Kim Aff. Ex. D at 6.  On the later produced version, the following alterations occur: on March 16,

"Sick" appears next to the pre-existing "E"; "E-sick" appears on March 22 and April 8; on July 1,

"Sick" appears next to the preexisting "P-day"; and on September 4, an indecipherable squiggle

mars the "U" in the "UA" designation.  An alteration also appears on the face of Riordan's

Discipline Tracking Log.  Whereas the earlier version, see Kim Aff., Ex. D at 5, documents a

violation on September 2, 2007, the nature of which is stated as, "Vomiting at Demo Station," the

later version includes underneath this notation, an additional statement, "violates san. rules," see

Kim Aff., Ex. C.  Plaintiff seeks sanctions against Defendant for these alterations.  Dkt. No. 28.

 The Second Circuit defines spoliation as "'the destruction or significant alteration of

evidence, or the failure to preserve property for another's use as evidence in pending or reasonably

foreseeable litigation.'"  Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 107 (2d Cir.

2001) (quoting West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999)).  Federal

Rule of Civil Procedure 37 empowers a court to impose sanctions when a party spoliates evidence in

violation of a court order.  See Fed. R. Civ. P. 37(b); West, 167 F.3d at 779.  Case law establishes

courts' inherent power to preserve the integrity of proceedings through the imposition of sanctions

for spoliation, even where no explicit discovery order has issued.  See West, 167 F.3d at 779;

Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 106-07 (2d Cir. 2002) (citing DLC

Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 135-36 (2d Cir. 1998)).

 When warranted, "a district court has broad discretion in crafting a proper sanction for

spoliation . . . ."  West, 167 F.3d at 779.  However, any sanction leveled "should be molded to serve

7

the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." Id. (citing

Kronisch v. United States, 150 F.3d 112, 126 (2d Cir.1998)).  District courts should craft sanctions

so as to: "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment

on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same

position he would have been in absent the wrongful destruction of evidence by the opposing party."

Id. (quotation marks and citations omitted); see also Zublake v. UBS Warburg LLC, 229 F.R.D.

422, 437 (S.D.N.Y. 2004).

One option available to courts as a remedy for spoliation is to provide a charge instructing

jurors that they are permitted to infer from the fact of the destruction or significant alteration of

relevant evidence, that such evidence, in its original form, would be unfavorable to the party

responsible for the spoliation.  See, e.g., id. at 439-40.  A party seeking an adverse inference charge

must demonstrate,

> (1) that the party having control over the evidence had an obligation to preserve it at the time
> it was destroyed; (2) that the records were destroyed "with a culpable state of mind"; and (3)
> that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable
> trier of fact could find that it would support that claim or defense.

Residential Funding, 306 F.3d at 107.

On the facts presented, the Court finds the alleged spoliation insufficient to warrant any

sanction.  The Court recognizes that the altered documents were in Defendant's sole possession and

that Defendant had an obligation to preserve them.  Notably, however, the records at issue were not

destroyed; Plaintiff, in fact, has copies of the documents as they existed prior to the alteration.  See

Kim Aff. Exs. B, C.  Thus, she is not particularly prejudiced by the alterations.

Plaintiff asserts that Defendant altered the documents intentionally in order to substantiate

its version of the case, Pl.'s MOL at 11-13, though she admits that "no witness could explain who

altered the documents, when they were altered, or why they were altered." Id. at 12. Nevertheless, it is indisputable that someone marked the documents at some point during the litigation while they were in Defendant's possession. Compare Kim Aff., Exs. B, C with Ex. D. This fact alone evinces some degree of negligence by Defendant, and establishes the requisite culpability for spoliation. Residential Funding, 306 F.3d at 108; Byrnie, 243 F.3d at 109.

Nevertheless, on the facts presented, an adverse inference is unwarranted. This is, in part, because the altered documents are not particularly relevant to this litigation. See Residential Funding, 306 F.3d at 108-09 ("relevant" in the sanctions context "means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence"). Plaintiff's assertion that the alleged spoliation shows a "clear effort by BJ's employees to alter critical personnel documents in an attempt to dishonestly substantiate its theory of the case that Riordan was vomiting from June to September," Pl.'s MOL at 11, cannot withstand scrutiny.

As to the Attendance Card, neither party has ever alleged that Riordan's attendance played any role in Defendant's decision to fire her. The relevancy of the alterations to the Discipline Tracking Log also eludes the Court. In her deposition, Plaintiff argues that there can be no reason except for age discrimination for her firing, noting that she did not have the requisite three "write-ups" for termination. Pl.'s Dep. (Dkt. No. 31-55) at 319:24-320:9. Were the number of "write-ups" truly at issue, the Discipline Tracking Log might take on greater significance (though the added marks might not). Defendant, however, never argues that it fired Riordan based upon the three write-up rule; rather, it maintains that her termination directly resulted from two "serious" incidents where Plaintiff violated sanitary rules, and these are both documented in the Corrective Interview Forms, see Kim Aff., Ex. D. Furthermore, Plaintiff did not sign the Discipline Tracking Log, so it

does not bear her imprimatur any more than the September 4, 2007 Team Member Corrective Interview Form, see id. at 2, which she refused to sign, and much less than the July 17, 2007 Team Member Corrective Interview Form, see Kim Aff., Ex. D at 3, which she did sign, and which clearly states the same information, id. ("vomiting in a bucket right at your food cart . . . is a very serious sanitation issue . . . . If you should vomit again at your cart you will be terminated immediately"). Pertinently, the Corrective appears to be the more authoritative documentation of the incidents in question.  When asked "What written reports are generated if somebody is disciplined, short of termination?", Personnel Supervisor Toich makes clear that a supervisor or manager would issue a corrective report, the supervisor or manager would give that corrective to her, and she would log it in on the discipline tracking log as part of the general personnel files.  Toich Dep. at 69:1-70:6; see also id. at 73:24-74:11 (recounting that Newberry referred to and read the September Corrective at Plaintiff's termination meeting); Ryan Dep. (Dkt. Nos. 23-11, 23-12) at 58:3-7, id. 67:19-68:16 (confirming that corrective and incident reports are generated when disciplinary actions are taken against an employee; after the fact, the disciplinary tracking log is used to track the issuance of correctives and incident reports); Mallaro Dep. (Dkt. No. 23-14) at 31-32.  Additionally, Defendant's summary judgment Motion never relies upon the altered Discipline Tracking Log, though it does reference the two Team Member Corrective Interview Forms.  Cumulatively, these facts lessen any importance that can reasonably be attributed to what are, in any event, innocuous alterations to Plaintiff's Disciplinary Tracking Log.

Plaintiff contends that the above alterations to the Attendance Card and Discipline Tracking Log support her general denial of numerous assertions by Defendant that rest upon documents in Defendant's sole possession.  See Pl.'s Reply (Dkt. No. 38); Pl.'s SOMF (Dkt. No. 27).  Plaintiff

may, of course, deny any assertion so long as she does so in good faith.  See Fed. R. Civ. P. 8; Local
R. 7.1(a)(3); Fed. R. Civ. 11.  The Court, however, will not assume that all of Defendant's records
lack integrity based upon minor alterations to two unimportant documents.

Although the Court denies Plaintiff's request for an adverse inference, it recognizes that
Defendant's careless treatment of her records understandably triggered her suspicion and caused her
to file her Cross-Motion.  Accordingly, the Court finds that an award of reasonable attorney's fees
and costs in connection with that Motion is proper, and it directs Plaintiff to submit an affidavit with
supporting documentation and time records within 30 days if she wishes to receive reimbursement.

## IV.    SUMMARY JUDGMENT

### A.  Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the
pleadings, depositions, answers to interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any material fact and that the moving
party is entitled  to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A fact is material if it
'might affect the outcome of the suit under the governing law.'"  Roe v. City of Waterbury, 542
F.3d 31, 35 (2d Cir. 2008) (quoting Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986)).

The burden rests on the movant to demonstrate the absence of a genuine issue of material
fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In deciding whether the movant has met
that burden, the court resolves all ambiguities and draws all permissible factual inferences in the
light most favorable to the non-moving party.  See Liberty Lobby, 477 U.S. at 255; Terry v.
Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003).  If the movant meets its initial burden, the non-moving
party must go beyond the pleadings and "do more than simply show that there is some metaphysical

11

doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Corp., 475 U.S. 574, 586

(1986). "The non-moving party may not rely on mere conclusory allegations nor speculation, but

instead must offer some hard evidence showing that its version of the events is not wholly fanciful."

D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998); FED. R. CIV. P. 56(e).

Since direct evidence of discriminatory intent is rarely available, "a trial court must be

cautious about granting summary judgment to an employer when . . . its intent is at issue." Gallo v.

Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). Nevertheless, "even

in the discrimination context, a plaintiff must provide more than conclusory allegations of

discrimination to defeat a motion for summary judgment." Schwapp v. Town of Avon, 118 F.3d

106, 110 (2d Cir. 1997) (citation omitted). Rather, to raise an issue of material fact, such allegations

"must be based upon 'concrete particulars.'" Id. at 111 (quoting Meiri v. Dacon, 759 F.2d 989, 998

(2d Cir. 1985). Thus, "affidavits and depositions must be carefully scrutinized for circumstantial

proof which, if believed, would show discrimination." Gallo, 22 F.3d at 1224.

"[T]he trial court's task at the summary judgment motion stage of the litigation is carefully

limited to discerning whether there are any genuine issues of material fact to be tried, not to

deciding them." Gallo, 22 F.3d at 1224. Summary judgment is proper "only when no reasonable

trier of fact could find in favor of the nonmoving party." Taggart v. Time, Inc., 924 F.2d 43, 46 (2d

Cir. 1991).

### B.  Age Discrimination Claims

The ADEA and NYHRL prohibit employers from discharging any individual on the basis of

age. See 29 U.S.C. § 623(a)(1); N.Y. EXEC. LAW § 296(1)(a). To succeed on a disparate treatment

age discrimination claim under the ADEA, a plaintiff "must prove, by a preponderance of the

evidence, that age was the 'but-for' cause of the challenged adverse employment action." Gross v. FBL Fin. Servs., Inc., 129 S. Ct. 2343, 2352 (2009).  That same standard presumably applies to claims brought under the NYHRL, see Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 106 n.6 (2d Cir. 2010), as courts in this Circuit analyze claims brought under the ADEA and NYHRL under the same legal framework.  See Tomassi v. Insignia Fin. Grp., Inc., 478 F.3d 11, 115 n.3 (2d Cir. 2007) (citing Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001)).

In McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the Supreme Court set forth the framework governing Title VII discrimination claims in a three-part burden-shifting test that was later adopted in the context of ADEA claims.  See D'Cunha v. Genovese/Eckerd Corp., 479 F.3d 193, 195 (2d Cir. 2007); Gallo, 22 F.3d at 1224.  While the Supreme Court's decision in Gross cast doubt on the continued viability of this framework's applicability to ADEA claims, 129 S. Ct. at 2349-51, the Second Circuit has retained the approach, albeit with a heightened burden placed on the plaintiff to show age was the "but-for" cause of the employer's adverse decision.  Gorzynski, 596 F.3d at 106.

Under the McDonnell Douglas framework, a plaintiff must establish, by a preponderance of the evidence, a *prima facie* case of discrimination; if the plaintiff succeeds in doing so, the defendant has an opportunity to produce evidence of a legitimate, non-discriminatory basis for its allegedly wrongful action; the burden then shifts to the plaintiff to demonstrate by a preponderance of the evidence that the employer's purported reason is mere pretext, and that its true motivation was unlawful discrimination.  See Texas Dep't of Cmty Affairs v. Burdine, 450 U.S. 248, 252-53 (1981) D'Cunha, 479 F.3d at 195; Schnabel v. Abramson, 232 F.3d 83 (2d Cir. 2000).

**(i)**   ***Prima Facie* Case**

13

Plaintiff's burden in establishing a *prima facie* case of age discrimination is not a heavy one, and is satisfied upon a showing "(1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." Gorzynski, 596 F.3d at 107 (citing Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000)); see Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994) (describing this burden as *de minimus*). Defendant concedes the presence of first three elements, but contends that Plaintiff has failed to raise an issue of material fact as to the fourth.

In support of her claim that her termination occurred under circumstances giving rise to an inference of discrimination, Plaintiff offers only her own deposition testimony, in which she states that Defendant replaced her with a woman in her late twenties or thirties.[4] See Pl.'s MOL at 8-9; Pl.'s Dep. (Dkt. No. 31-55) at 335-338. Though Defendant denies that it hired a replacement for Riordan, Answer (Dkt. No. 7) at ¶ 23, when Plaintiff returned to the store sometime "shortly after [she] got fired," she saw a young woman whom she did not recognize passing out popcorn in the spot where she used to work. Pl.'s Dep. (Dkt. No. 31-55) at 335-338. Plaintiff cannot remember when this visit occurred, and admits that she only saw this individual on one occasion. Id. at 338-340. Plaintiff also admits that she does not know whether this young woman had worked at the store prior to her own termination. Id. at 335:13-14

---

[4] The Court notes that, while not argued as such, Plaintiff's allegations regarding the allegedly discriminatory remarks made by Toich around the time of Plaintiff's termination, could bolster her *prima facie* case. Pl.'s MOL at 10-11. As discussed below, however, these alleged statements are not probative of discriminatory intent. See *infra* sec. IV.B.(iii).

Defendant asserts that it did not hire a replacement for nineteen months after Plaintiff's termination, though it did hire temporary seasonal holiday help, as was its practice, including two individuals, ages 63 and 30 to work as Merchandise Demonstrators.  Def.'s SOMF (Dkt. No. 23-1) ¶¶ 107-09.  Additionally, Defendant states that it cross-trains staff members who are not Merchandise Demonstrators, to perform demonstrations.  Id. at ¶ 111.  Defendant insists that Plaintiff's allegation that she was replaced is wholly conclusory, unsupported by any record evidence, and insufficient to raise an issue of material fact and sustain her burden of raising a *prima facie* case.  Def.'s Reply (Dkt. No. 35) at 3-4.

Where a plaintiff demonstrates that her employer replaced her with a significantly younger individual, she has met the minimal burden of establishing a *prima facie* case of age discrimination.  See, e.g., Carlton, 202 F.3d at 135 (citing O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 313 (1996)).  Riordan, however, has failed to demonstrate any such thing.  Her only evidence of her being replaced is that, on one occasion, at some date she cannot remember, she saw someone she did not recognize, performing the work that she had previously performed.  Yet, she asserts that Defendant replaced her with a much younger individual.  Such "conclusory" allegations fail to raise an issue of material fact or to satisfy the minimal burden Plaintiff faces in establishing a *prima facie* case of age discrimination.  See Schwapp, 118 F.3d at 111 (evidence of discrimination "must be based upon 'concrete particulars,' not conclusory allegations").  Accordingly, the Court finds that Plaintiff has not met her burden at the first stage of the burden shifting framework.

### (ii)    Legitimate, Nondiscriminatory Basis for Plaintiff's Termination

Even if Plaintiff could sufficiently establish a *prima facie* case of age discrimination, her claim would still fail.  Defendant has produced evidence that, if taken as true, would permit the

conclusion that Plaintiff was terminated for a legitimate reason.  Defendant has offered Plaintiff and others' depositions and two Corrective Interview Forms attesting to Defendant's understanding that Plaintiff had committed "serious" violations of sanitary rules, and that this was the reason for her termination.  See, e.g.,  Pl.'s Dep. (Dkt. Nos. 31-52) at 187:17; id. (Dkt. No. 31-55) at 332:11-334:10; Toich Dep.(Dkt. No. 23-15) at 80-84; Ryan Dep. (Dkt. No. 23-12) at 124:4-8; Kim Aff., Ex. D; see also Food Handler Sanitary Standards (Dkt. No. 23-23).  Defendant has thus provided a legitimate purpose for its action and has explained its decision to terminate Plaintiff in a manner allowing her "a full and fair opportunity to demonstrate pretext."  Burdine, 450 U.S. at 256.

### (iii)    Pretext for Unlawful Discrimination

The burden thus shifts back to Plaintiff, who may no longer rely on the presumption of discrimination raised by her *prima facie* case.  Id.  Instead, she must present direct and/or circumstantial evidence that would allow a reasonable fact-finder to conclude that but-for her age, Defendant would not have fired her.  See Schnabel, 232 F.3d 83 (to survive summary judgment in an ADEA claim, a plaintiff must introduce enough evidence either in establishing a *prima facie* case, by demonstrating pretext, or through additional evidence that would permit reasonable fact finder to conclude that she met her "ultimate burden"); Gorzynski, 596 F.3d at 107 (where the burden shifts back to plaintiff, the court must determine "whether [she] has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that her age was a 'but for' cause of" the adverse action).

In attempting to show that "but for" her advanced age, Defendant would not have fired her, Plaintiff offers four arguments aiming to establish that Defendant's purported reason for firing her is mere pretext.  First, she submits that the "ageist remarks" made by Jim Dobiel, a BJ's store

16

manager, satisfy this prong.  Pl.'s MOL at 9-10.  Approximately three years prior to Plaintiff's

termination, Dobiel allegedly told Plaintiff that she was "too old to work" and should quit.  Pl.'s

Dep. (Dkt. No. 31-51) at 121:18-21; id. at 122:9-24; Pl.'s MOL at 9.  Plaintiff appears to attribute

additional significance to this event by emphasizing that there is no documentation of Dobiel's

comment despite the fact that Mallaro remembers having a contemporaneous phone conversation

with Plaintiff regarding the way Dobiel handled a situation involving Riordan.  Pl.'s MOL at 9-10;

see also Mallaro Dep. (Dkt. No. 31-41) at 23:9-25:21.

Plaintiff next argues that Toich also made comments evincing discriminatory animus.  Pl.'s

MOL at 10.  According to Riordan, Toich repeatedly urged her to go down to Florida to live with

her daughter, or to take a six-month vacation in Florida, and even offered to try to get her a transfer

to Florida.  Pl.'s Dep. (Dkt. No. 31-55) at 328:9-331:10.  Plaintiff had responded to these

suggestions by saying she that did not like Florida and was not interested in a transfer.  Id.  She did

not complain to anyone at BJ's about Toich's statements, a fact that she attributes to Defendant's

failure to train its employees on how to file such complaints.  Pl.'s MOL at 3-4.  Plaintiff adds that

at her termination meeting, Toich and Newberry told her to "take a six-month vacation . . . . because

maybe you'll feel better."  Pl.'s Dep. at 331:17-334:10.

Third, Plaintiff contends that Defendant had no anti-discrimination policy in place in 2007,

nor any policy of training its employees to report workplace discrimination; Plaintiff claims that

these failures are direct evidence of pretext.  Id. at 11.  Finally, Plaintiff argues that the spoliation of

Plaintiff's personnel documents is "conclusive" evidence of pretext.  Id.

None of the above arguments suggest that Defendant was motivated by discriminatory

animus when it fired Plaintiff.  Regarding the allegedly discriminatory remarks, the law is clear:

17

"the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." Tomassi, 4781 F.3d at 115. "The relevance of discrimination-related remarks does not depend on their offensiveness, but rather on their tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class." Id. at 116. In determining whether a reasonable fact-finder could conclude from remarks made in the workplace that an employer's purported reason for taking adverse action against an employee is pretext, district courts generally consider:

> (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 149 (2d Cir. 2010).

Dobiel's alleged remark clearly fails to raise an issue of material fact. While he was Plaintiff's supervisor at the time that he allegedly made a remark that a reasonable juror could view as discriminatory, he made that comment years prior to the adverse employment action, and he is not alleged to have been involved in the decision to terminate Plaintiff. Thus, Dobiel's "stray remark" offers no support for Plaintiff's claim. See Tomassi, 4781 F.3d at 115; Ostrowski v. Atl. Mut. Ins. Cos., 968 F.2d 171, 182 (2d Cir.1992) ("'stray' remarks in the workplace by persons who are not involved in the pertinent decisionmaking process" do not constitute circumstantial evidence sufficient to entitle a plaintiff to a burden-shifting instruction); Henry, 616 F.3d at 150. The lack of documentation of the offensive remarks adds nothing to the alleged incident's probative value.

Toich's comments, urging Plaintiff to "go to Florida" are equally non-probative of Defendant's discriminatory intent. Plaintiff attempts to characterize Toich as a decision-maker,

emphasizing her role in the employee hiring process and the fact that Toich drafted the Final Team

Member Corrective Interview Form on July 17, 2007.   Pl.'s MOL at 10.   Whether or not Toich had

an instrumental role in Defendant's decision to hire Plaintiff is irrelevant to whether Toich qualifies

as a decision-maker in Defendant's decision to terminate her ten years later.   Toich's deposition

testimony, uncontradicted except by Plaintiff's conclusory claims, makes clear that she played no

role in the decision to terminate Plaintiff.   See Toich Dep. (Dkt. No. 23-15) at 82:18-21 ("I did write

up – I didn't issue her the corrective, but I did write up a corrective stating that . . . it was witnessed

that there was vomit in the bucket"); id. at 62:16-18 ("I never could do the issuing [of a disciplinary

corrective] because I wasn't a manager . . . . I would file it"); id. at 67:11-14; id. at 69:16-19; id. at

71:1-14 (stating the only role she played in Plaintiff's termination was sitting in as a witness).

　　　　Other factors also weigh in favor of treating Toich's comments merely as "stray remarks"

that raise no issue of material fact.   Toich made her remarks closer in time to Plaintiff's termination

than those made by Dobiel, but there is nothing to suggest that they were related to the firing.   More

importantly, the complained of remarks are wholly innocuous.   No reasonable juror could find that

Toich's suggestion that Plaintiff "go to Florida," particularly in the context of Toich's knowing that

Plaintiff's husband had recently died and Plaintiff's daughter lived in Florida, is evidence of age

discrimination.[5]   See Tomassi, 4781 F.3d at 116 ("The relevance of discrimination-related remarks .

. . depend[s] . . . on their tendency to show that the decision-maker was motivated by assumptions or

attitudes relating to the protected class"); Cozzi v. Great Neck Union Free Sch. Dist., No. 05-CV-

1389, 2009 WL 2602462, at *9, *17 (E.D.N.Y. Aug. 21, 2009) (expressing doubt that questions like

---

　　　　[5] Toich allegedly made the remarks before and after Plaintiff's husband died.  Pl.'s Dep.
(Dkt. No. 31-55) at 329-31.

"why are you working so hard?" and "don't you want to spend more time with your grandchildren?" "are indicative of animus of any sort"); <u>Infante v. Ambac Financial Grp.</u>, No. 03-CV-8880, 2006 WL 44172, *7 (S.D.N.Y. Jan. 5, 2006) (interview questions asking how plaintiff's being a mother of two and living in a neighboring state "fit into the mix" and affect her desire to work for interviewee are "innocuous comments" and do not suggest of gender discrimination).  The same is true of Toich and Newberry's suggestion that Plaintiff take a vacation.  Aside from being innocuous, Plaintiff admits that the two said this to her while showing concern for her health.  Pl.'s Dep. at 334. Nothing about the comment, or the context in which it was delivered, suggests discriminatory intent.

Plaintiff claims that Defendant failed to distribute anti-discrimination policies or provide avenues for receiving employee complaints – allegations contested by Defendant – and asserts this "fact" is direct evidence of pretext.  Pl.'s MOL at 11.  Such failures, if true, might be relevant to Defendant's liability for discriminatory acts perpetrated by a supervisory employee.  <u>See</u> <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 767 (2d Cir. 1998); <u>Morris v. CNY Centro, Inc.</u>, 99 F. Supp. 2d 241, 248 (N.D.N.Y. 2000).  They are not, however, in themselves discriminatory acts.  They provide no evidence from which a reasonable jury could infer discrimination and find in favor of Plaintiff, and hence provide no basis for denying summary judgment.

Finally, Plaintiff's claims regarding the conclusive character of the altered evidence are greatly overstated.  As discussed above, <i>supra</i> sec. III., the altered documents play no role in Defendant's Motion and do not provide any support for Plaintiff's claim that Defendant's action was motivated by discriminatory animus.

While not raised in her opposition papers, Plaintiff asserts in her deposition that she did not, in fact, vomit at her cart on July 17, 2007 or September 2, 2007.  Pl.'s Dep. (Dkt. Nos. 31-54, 31-

55) at 260, 321-22.  Assuming the truth of this assertion, it nevertheless fails to raise an issue of triable fact as whether Defendant believed that she had vomited and acted upon such belief, and it provides no basis whatsoever upon which a reasonable jury could conclude that "but for" Plaintiff's age, Defendant would not have fired her.  Having failed to establish the existence of any triable issue of fact suggesting that Defendant's legitimate concern in maintaining sanitation standards is pretext, and that its decision to fire Plaintiff was, in fact, motivated by discrimination based on age, Plaintiff has not met her burden.

**V.      CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED**, that Defendant's Motion for summary judgment (Dkt. No. 23) is **GRANTED**; and it is further

**ORDERED**, that Plaintiff's Cross-Motion for sanctions and/or inference of discrimination (Dkt. No. 28) is **DENIED**, but the Court shall award reasonable attorney's fees and costs associated with that Cross-Motion.  Plaintiff shall submit an affidavit with supporting documentation and time records within 30 days if she wishes to receive reimbursement; and it is further

**ORDERED**, that the Clerk serve a copy of this Order on the parties.

**IT IS SO ORDERED.**

DATED:        January 14, 2011
                 Albany, New York

Lawrence E. Kahn
U.S. District Judge

21